## DECLARATION OF SOHAM AWON

Pursuant to Title 28, United States Code, Section 1746, the undersigned states under penalty of perjury as follows:

1. My name is Soham Awon and I am over the age of eighteen.

2. I currently reside in New York, New York.

3. The highest level of education I have attained was a bachelor's degree in finance, which I received from Kelley School of Business at Indiana University in 2015.

4. I make the statements herein based on personal knowledge obtained while I was employed by GPL Ventures, LLC (hereinafter referred to as "GPL").

5. This Declaration does not contain all information I possess regarding the operations of GPL but is focused on GPL's practice of obtaining shares of publicly traded stock through private transactions and selling those shares in public transactions to the investing public.

6. Alex Dillon ("Dillon") and Cosmin Panait ("Panait") are co-managers and owners of GPL.

7. I initially began working with Dillon and Panait in 2016 with another company they owned and co-managed which had a similar business as GPL.

8. While employed at the other company, Dillon and Panait would have me work on deals for GPL. In or around 2018, I became an employee with GPL.

9. At all times while working at GPL, I reported directly to Dillon and Panait.

10. Initially, I worked as an origination analyst responsible for sales activities. The sales activities involved pitching distressed microcap securities issuers to determine whether the issuers had aged, outstanding notes, also known as "aged debt."

11. I understood, and currently understand, that "aged debt" would mean debt instruments issued by public issuers that has been held by a noteholder for long enough to convert the notes into unrestricted, free-trading stock to sell in public sales.

12. Besides inquiring whether microcap issuers had aged debt on their books, I contacted executives at microcap issuers to determine whether they wanted funding in exchange for issuing large blocks of stock to GPL.

13. In or around 2018, I was promoted to head of operations. As head of operations, among other things, after Dillon and Panait had agreed to terms with selling noteholders and senior management of microcap issuers, I coordinated and submitted paperwork for investment deals with microcap issuers; and compiled and submitted paperwork to facilitate the deposit of shares of microcap issuer shares at broker-dealers.

14. Throughout the time I was employed at GPL, GPL's business consisted of obtaining securities issued by publicly-traded microcap issuers at discounts to the prevailing market price, depositing the shares with broker-dealers, and promptly selling the shares in sales to the public through the Over The Counter market.

15. Typically, GPL acquired large blocks of securities by (a) buying aged convertible debt from noteholders, which were then converted into free-trading shares of stock; or (b) from issuers through Regulation A ("Reg. A") offerings with GPL often, if not always, as the exclusive purchaser of the Reg. A shares.

16. GPL hired origination analysts who contacted senior management of microcap issuers that were in need of capital, had a high debt burden, and precarious financial position. Additionally, GPL engaged college interns to assist in origination efforts during the summers.

17. The purpose of the origination analysts' contacts with senior management of these microcap issuers was to determine the issuers' interest in introducing GPL to noteholders and the issuers' interest in having GPL invest capital with the microcap issuer through a Reg. A offering.

18. While I was an origination analyst, GPL provided me with a list of microcap issuers to contact, and GPL provided the same types of lists to other origination analysts and interns.

19. As was the case with other origination analysts and interns, GPL provided me with a script of talking points to raise with senior management with microcap issuers.

20. As part of the pitch process, origination analysts asked senior management of the microcap issuer whether the issuer wanted new funding as an entrée to acquiring aged debt. If management expressed an interest in funding, the origination analyst expressed concern about the debt the issuer owed to third-party noteholders and asked for information regarding those notes.

21. As a means to induce senior management of microcap issuers to introduce GPL to noteholders with aged debt, GPL offered additional, direct funding to such microcap issuers which were struggling financially with limited access to capital.

22. More often than not, senior management from the microcap issuers took the agreements for the purchase of the notes from GPL and acted as the point of contact to arrange for the sale by the selling noteholder to GPL.

23. On other occasions, senior management from the issuer provided GPL with contact information for the noteholders or introduced GPL to the noteholder.

24. Once senior management from microcap issuers was interested in a deal with GPL, Dillon or Panait took the lead on their respective deals by negotiating directly with senior management of the microcap issuers and overseeing financing for their respective deals.

25. Simultaneously with the negotiations for the purchase of the aged debt from noteholders, Dillon and Panait renegotiated the terms of the aged debt with the issuer to obtain more advantageous terms for the new, or "replacement," notes, including reduced conversion rates at a substantial discount to the then-prevailing market price for the issuer's stock.

26. Dillon and Panait were the persons from GPL who ultimately negotiated the terms for the replacement notes.

27. After the noteholder agreed to sell to GPL and the issuer agreed to the terms of a replacement note, I sent a packet of documents for closing. Once closed, I sent the packet to the transfer agent and one or more broker-dealers selected for the liquidation of the shares. This packet included (a) the assumption and assignment agreement for the acquisition of the aged debt; (b) the replacement note; (c) an escrow agreement for the disbursement of the purchase proceeds to the former noteholder, including proof of consideration into escrow; (d) a reserve letter from the issuer to the transfer agent; (e) a notice of conversion of a portion of the replacement note; (f) an attorney opinion letter that the shares converted from the portion of the debt should be issued without reference to any restriction; and (g) instructions for the deposit of shares with the broker-dealer.

28. The reserve letter from the issuer to the transfer agent authorized the transfer agent to hold in reserve authorized, but unissued, shares of the issuer and to issue shares to GPL pursuant to a notice of conversion without any further action on the part of the issuer.

29. Typically, it was only after the transfer agent had delivered the shares issued pursuant to the notice of conversion, and the broker-dealer had approved the deposit of the shares into GPL's account, that GPL would instruct the escrow agent to release all or a portion of the purchase proceeds for the aged debt to the former noteholder.

30. Among other things, my job as head of operations at GPL was to coordinate the paperwork necessary for Reg. A subscriptions, the conversion of the aged debt into shares of microcap issuers' stock, and the delivery of those shares to the broker-dealer that GPL had selected for liquidating the shares.

31. Dillon and Panait decided when to convert aged debt into shares of stock, the amount of conversions, the deposit of shares of stock into GPL's brokerage accounts for selling to the investing public, and when to begin selling the stock.

32. If Dillon and Panait believed that the conversion terms of potential aged debt purchases were not advantageous enough for GPL, Dillon and Panait would negotiate directly with microcap issuers to obtain better conversion terms with a discount to the market price.

33. Many times, Dillon, and especially Panait, would try to sneak in terms for the replacement notes that provided even deeper discounts for GPL without discussing the terms with issuers.  Often when this occurred, senior management from the microcap issuers would express their shock because they had not agreed to the terms, even though they had executed the agreements.

34. Because of the precarious financial condition of these microcap issuers and the need for additional funding that was not available from other sources, the microcap issuers would accept amending the notes to provide more advantageous terms to GPL.

35. Often, when seeking to purchase aged debt, the amount of GPL's direct funding was directly connected to the amount of shares of stock GPL could acquire from converting aged debt.

36. GPL dictated steeper discount conversion rates for replacement notes based on the fact that the microcap issuers were desperate for additional funding, and therefore agreed to these terms. The steeper the conversion rate, the more funds GPL would provide the microcap issuers.

37. In the majority of the Reg. A offerings, when GPL agreed to invest, GPL introduced lawyers and transfer agents to the microcap issuers to use for the Reg. A offering and demanded that GPL be the exclusive liquidity source for the microcap issuer.

38. GPL also introduced microcap issuers to accountants to help with preparing periodic financial statements for presentation to OTC Markets for publication with the goal that the issuer would be current in its filings; though, some issuers did not become current.

39. At times, GPL insisted that the microcap issuer switch transfer agents to a transfer agent over which GPL had more control in terms of converting aged debt into shares of stock and having the shares deposited into a brokerage account.

40. At times, when GPL invested in a Reg. A offering or aged debt, GPL introduced microcap issuers to investor relations firms who would be hired as a consultant to the issuer using proceeds from the Reg. A offering or a new-issue convertible note. On other occasions, GPL insisted that the microcap issuer hire an investor relations firm. In both instances, the use of investor relations firms would generate interest in the issuers' stock through promotional campaigns. In this way, GPL sought to ensure that the market for the issuers stock was liquid enough for GPL to invest in a tranche of the Reg. A offering, acquire the issuer's stock, and sell the stock acquired through the Reg. A offering into the market in a short period of time.

41. At times, if the market for the microcap issuer's stock was too illiquid, GPL would refuse to continue to invest in additional tranches of the Reg. A offering.

42. The use of investor relations firms enabled GPL to generate buyer interest in the market for the microcap issuers' stock so that GPL could sell its shares of stock acquired through the Reg. A offerings.

43. After GPL deposited its shares from Reg. A offerings at a broker-dealer, it would generally sell them in the market depending on how much liquidity was generated from the investor relations firms' campaign.

44. Dillon and Panait were very involved with the timing and process for liquidating the stock GPL had acquired through the manner described above. In fact, one or both of them gave directives on how the stock should be sold. They were very hands-on in this regard. Dillon and Panait also had access to Level 2 market data, giving them real time access to bid and ask quotations for the stock, and often gave instructions for the liquidation when they noticed something that warranted an increase or decrease in their stock sales.

45. GPL's business model was to generate profits derived from the spread between the discounted price of the shares of stock it acquired, either through the purchase of aged debt or investments in Reg. A offerings, and the market price for the microcap issuers' stock.

46. GPL timed its sales of stock to avoid holding more than 9.9% of any microcap issuer's stock at any one time.

47. In order to remain below 9.9%, GPL held shares of stock with a transfer agent and deferred depositing the shares into its brokerage accounts until GPL had sold enough shares to remain below 9.9%.

48. At times, if the market price for a microcap issuer's stock fell below the offering price for a Reg. A offering, GPL had the issuer arrange for GPL to acquire aged debt at a conversion rate significantly below the prevailing market price for the microcap issuer's stock. In this way, GPL's cost basis for its Reg. A investment, along with the shares acquired through converting the aged debt, would provide a sufficient spread to ensure profitability.

49. I resigned from GPL on June 2, 2021.

50. Upon leaving GPL, Dillon asked me to sign and be bound by the terms of a new agreement with GPL (the "Severance Agreement"). Under the terms of the Severance Agreement, GPL would retain an attorney to represent me at no cost to me in connection with any investigation by the government or self-regulatory investigation related to my work at GPL, provided that I agree first to give notice to GPL within five (5) days of being contacted by the government and to cooperate with GPL under a joint defense agreement.

51. Under the Severance Agreement, GPL would pay me $10,000.

52. I declined to enter into the Severance Agreement.

53. To my knowledge, GPL's business practices have not changed since I resigned on June 2, 2021.

54. I submitted a whistleblower complaint to the Securities and Exchange Commission on Form TCR regarding my observations of the conduct at GPL.

I do hereby declare under penalty of perjury that the foregoing is true and correct.

_8/12/21_____  
Dated

Soham Awon