## DECLARATION OF RICHARD EDELSON

Pursuant to Title 28, United States Code, Section 1746, the undersigned states under penalty of perjury as follows:

1. My name is Richard Edelson and I am over the age of eighteen.

2. I currently reside in Dix Hill, New York.

3. The highest level of education I have attained was a bachelor's degree in 1991, which I received from C.W. Post in Brookville, New York.

4. I make the statements herein based on personal knowledge obtained as a consultant for GPL Ventures, LLC (hereinafter referred to as "GPL").

5. This Declaration does not contain all information I possess regarding the operations of GPL but is focused on GPL's practice of obtaining shares of publicly traded stock through private transactions and selling those shares in public transactions to the investing public.

6. Alex Dillon ("Dillon") and Cosmin Panait ("Panait") are co-managers and owners of GPL.

7. I have been providing consulting services for GPL since 2015, including tax preparation assistance, presenting profit and loss statements, and other reporting as needed related to convertible notes.

8. I deliver the reports that I generate for GPL to Dillon and Panait.

9. From time to time, GPL has introduced me to microcap issuers to provide them with accounting services, including helping to prepare periodic financial statements for presentation to the OTC Markets for publication.

10. GPL maintains a demand deposit account with Signature Bank (the "Signature Bank Account").

11. As of recently, the Signature Bank Account was holding approximately $86 million.

12. When GPL invests in microcap issuers, whether through the purchase of aged debt from noteholders or investing in Regulation A ("Reg. A") offerings, GPL has delivered the funds for the purchase of investments from the Signature Bank Account.

13. When GPL liquidates securities and receives proceeds from those stock sale transactions, GPL delivers the proceeds from the stock sale transactions to the Signature Bank Account.

14. On approximately a weekly basis, Dillon transfers stock sale proceeds from various brokerage accounts to the Signature Bank Account.

15. Prior to Signature Bank, GPL utilized a bank account with another bank. My recollection is that in or around 2017 or 2018, the other bank closed GPL's account.

16. Other than the Signature Bank Account and an account at Bank of America, I am not aware of any other bank accounts utilized by GPL for conducting its investment business. GPL uses separate bank accounts to process business expenses, such as payroll and rent, but I am not involved with handling such accounts.

17. Since at least 2017, GPL has either purchased notes issued by, or invested in Reg A offerings for, approximately 140 distinct microcap issuers.

18. Since 2017, GPL has generated profits of at least $81 million as a result of the above-described transactions.

19. GPL has maintained a relationship with a firm called Blacktower Financial Management Group ("Blacktower") in Grand Cayman, Cayman Islands since approximately 2020.

20. In order to sell stock through Blacktower, it is GPL's practice to deliver shares of stock offshore to Blacktower, and then for Blacktower to liquidate the shares for GPL and forward the stock sale proceeds to GPL's Signature Bank Account.

21. The delivery of stock sale proceeds from Blacktower for deposit in the Signature Bank Account happens every few days and has been ongoing through the present date.

22. In or around 2020, GPL opened an account at BMO Harris through an investment advisor called Palos Wealth Management ("Palos") in Toronto, Canada.

23. In the course of my consulting services for GPL, I have learned that GPL has approximately $15 million in cash and $10 million in marketable securities at BMO Harris.

24. GPL also maintains several other brokerage accounts, including an account with LEK Securities. GPL maintains approximately $15 million as collateral to be able to trade through LEK.

25. As a part of my services of providing profit and loss statements for GPL's trading activities, I reviewed the terms of the aged debt that were originally issued to third party noteholders and the modified terms that GPL negotiated directly with senior management and owners of microcap issuers to determine the cost basis for the securities that GPL sold in public transactions.

26. In almost all of the transactions in aged debt purchases by GPL, I noticed that GPL negotiated modified terms for the aged debt in a manner that was more advantageous for GPL.

27. One of the modified terms that GPL added for the aged debt concerned lowering the stock conversion prices of the notes to be more favorable to GPL to reflect a discount to the prevailing market price.

28. GPL also negotiated new terms for the aged debt to protect GPL in the event that the issuer's stock price fell even below the discounted stock conversion rate in the notes. Specifically, when that happened, the issuer would be required to make up the difference between the stock conversion price and the market price of the stock by issuing more shares to GPL.

29. On multiple occasions, GPL would include these new terms for the notes without ever negotiating or discussing GPL's new terms with the senior management of the microcap issuers in the hopes that the issuer would sign the new terms without realizing the ramifications of the new terms.

30. I submitted a whistleblower complaint to the Securities and Exchange Commission on Form TCR regarding my observations of the conduct at GPL.

I do hereby declare under penalty of perjury that the foregoing is true and correct.

8/11/2021
Dated

Richard Edelson