UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                             **Plaintiff,**<br><br>    -against-<br><br>GPL VENTURES LLC,<br>GPL MANAGEMENT LLC,<br>ALEXANDER J. DILLON,<br>COSMIN I. PANAIT,<br>HEMPAMERICANA, INC.,<br>SALVADOR E. ROSILLO,<br>SEASIDE ADVISORS, LLC, and<br>LAWRENCE B. ADAMS,<br><br>                            **Defendants.** | 21 Civ. \_\_\_\_\_ (   ) |

**DECLARATION OF PETER LAMORE**

I, Peter Lamore, pursuant to 28 U.S.C. 1746, declare as follows:

      1.      I am over the age of 18.  I am a staff accountant employed by the United States Securities and Exchange Commission ("Commission").  I submit this Declaration in support of the Commission's motion for emergency relief, including an asset freeze, against Defendants GPL Ventures LLC ("GPL Ventures"), GPL Management LLC ("GPL Management"), Alexander J. Dillon ("Dillon"), Cosmin I. Panait ("Panait" and, together with GPL Ventures, GPL Management, and Dillon, the "GPL Defendants").

      2.      As part of my duties as a Commission staff member, I regularly review and analyze financial and other documents obtained during investigations.  I am also expected to assist enforcement attorneys by preparing declarations describing the work I performed and the

results of analyzes I make.  I am also expected to testify at hearings or trial as a summary witness.

3. This declaration is based upon my review of information obtained by the Commission staff during the investigation that preceded this action involving the GPL Defendants.

4. I participated in the investigation, and the facts set forth herein are based upon records and other information obtained by the Commission during its investigation and contained in the files of the Commission.  To conduct the investigation, my colleagues and I have, among other things, obtained and analyzed bank records, brokerage records, wire transfers, and other financial records, reviewed publicly available information as well as emails and other written communications between brokerage firms and the GPL Defendants, and conducted witness interviews.

5. The SEC obtained some records voluntarily, while others were produced in response to subpoenas.  The SEC also collected publicly available records.  Upon receiving documents from witnesses and other third parties, the SEC stored them, in the order and form as received from the producing party, on a restricted access document-management database, where I have accessed the documents described below.

6. The SEC has alleged in the complaint that, since early 2017 through the present, the GPL Defendants have been acting as unregistered securities dealers by privately acquiring large blocks of stock in approximately 140 microcap issuers from at least early 2017 to the present (the "relevant period") and publicly selling those blocks into the market for their own account, generating proceeds of at least $81 million.

7. This calculation is based on the amount held in the GPL Defendants' main bank account at Signature bank as of the end of May 2021 ($67 million) plus amounts transferred to Dillon and Panait ($14 million). This is a reasonable estimate of the GPL Defendants' proceeds from their unregistered dealer activities. As described further below, based on my review of the investigative file and participation in interviews with witnesses, I understand that the GPL Defendants buy securities in private transactions, deposit the securities in brokerage accounts, sell the securities, and transfer the proceeds to the Signature bank account. Thus, the balance in the Signature bank account, plus the amounts transferred to Dillon and Panait, represents the proceeds from the GPL Defendants' stock sales.

8. Based on my review of documents obtained during our investigation, as well as statements made by witnesses to the GPL Defendants' trading activities, I have confirmed that the GPL Defendants business is privately acquiring large blocks of stock of microcap issuers pursuant to Regulation A offerings, or convertible notes, and then publicly selling those blocks into the market for their own account. I have also confirmed that the GPL Defendants are not registered as dealers with the Commission, and I confirmed that neither Dillon nor Panait is currently associated with a registered broker-dealer.[1]

9. In addition, I have confirmed that the GPL Defendants' business is privately acquiring discounted shares of microcap issuers and then selling those shares into the market, that Dillon and Panait have exercised control, directly or indirectly, over GPL Ventures and GPL Management, and that Dillon and Panait make all of GPL Ventures' and GPL Management's stock trading decisions, instructing when stock is to be sold.

---

[1] Dillon was briefly employed at a broker-dealer in 2013.

10. I have also confirmed that the GPL Defendants business model it to arrange for cold-callers to pitch themselves to publicly traded microcap issuers, offering capital infusions, purportedly to support the issuers' operations. At times, other services are pitched or provided, such as installing an "investor relations" firm, or introducing an in-house accountant to assist with preparing the issuers' financial statements. Once an issuer agrees to be funded, the GPL Defendants acquire large blocks of the issuer's unrestricted stock at a steep discount to the price it is trading in at the market, either by: 1) purchasing aged convertible notes from the issuer's debtholders, which notes the GPL Defendants then convert into shares; or 2) purchasing shares directly from the issuer through qualified Regulation A offerings.

11. As noted above, since at least early 2017 and continuing to the present, the GPL Defendants have acquired and sold stock of at least 140 microcap issuers pursuant to their business model.

12. Typically, after purchasing a block of shares in a given issuer, the GPL Defendants begin to sell the shares promptly after depositing those shares at a broker-dealer, and generally sell most or all shares before purchasing another block in the same issuer.

13. For example, on January 22, 2021, the GPL Defendants purchased 100,000,000 shares of an issuer, "Issuer A," and on January 25, 2021, they deposited the shares with a broker-dealer. The same day, the GPL Defendants executed orders to sell all of the shares, with the sales settling two days later, on January 27, 2021. The GPL Defendants then purchased additional rounds of Issuer A stock, depositing 250,000,000 shares on February 2, 2021 and 600,000,000 shares on February 10, 2021. Within days of each deposit, the GPL Defendants initiated stock sales until they sold all the shares in transactions that settled by February 5 and 17, 2021, respectively. The GPL Defendants paid $475,000 for the shares, and sold the shares for

$5,205,334, representing a nearly ten-fold profit. Attached as Exhibit 1 is a list of the deposits and subsequent sales.

14. Another example of the GPL Defendants selling shares of an issuer promptly after depositing those shares at a broker-dealer involves "Issuer B." On August 7, 2020, the GPL Defendants purchased 31,250,000 shares of Issuer B stock, and on August 11, 2020, they deposited the shares with a broker-dealer. On August 13, 2020, they began selling the shares, for settlement on August 17, 2020, and continued selling regularly through settlement date of September 2, 2020, by which time they sold nearly all of the shares. They began again on September 3, 2020, when they deposited an additional 40,000,000 shares. The GPL Defendants began executing orders to sell Issuer B stock starting on the same day, for settlement on September 8, 2020, and continuing through September 21, 2020, by which time they had sold all the shares. They then engaged in a third round starting on September 29, 2020, depositing 35,000,000 shares and selling them through October 29, 2020. The GPL Defendants paid $425,000 for the shares, and sold the shares for $564,163, representing nearly thirty-three percent profit. Attached as Exhibit 2 is a list of the deposits and subsequent sales.

15. From their sale of HempAmericana stock, I calculated that between July 2017 and January 2021, the GPL Defendants reaped gross proceeds of approximately $18.3 million, for a net profit of approximately $10.7 million. They did this by engaging in the same pattern of acquiring blocks of HempAmericana stock and promptly selling the stock. Attached as Exhibit 3 is a chart showing an example of three blocks of 34,000,000 shares each that the GPL Defendants deposited and quickly sold in its brokerage account during March and April 2018.

16. While I have not completed an analysis of additional profits in June and July, the current balance in the GPL Ventures account at Signature Bank is approximately $84 million, all

of which could easily be transferred out using various fund movement mechanisms, such as wires, ACH, or checks.

17. Attached as Exhibit 4 is a chart listing the GPL Defendants' known financial accounts that the Commission requests be frozen.

18. From my review of the GPL Defendants' brokerage and financial records, I have observed that, as noted above, the GPL Defendants' accounts at Blacktower Financial in the Cayman Islands have transferred funds into the GPL Defendants' accounts at U.S. brokers and financial institutions. During the period from November 2020 through April 2021, a total of approximately $3.4 million has been transferred into the GPL Defendants' accounts at Signature Bank. Attached as Exhibit 5 is a chart showing the amounts transferred from Blacktower Financial to the GPL Defendants' accounts at Signature Bank.

19. Based on their activities at U.S. broker dealers, I suspect the GPL Defendants are depositing shares of microcap issuers with Blacktower Financial, and the transfers into Signature Bank represent proceeds from selling the shares.

20. While I have not observed transfers of funds from the GPL Defendants' accounts at Signature Bank or other U.S. brokers and financial institutions to the GPL Defendants' accounts at Blacktower Financial in the Cayman Islands, they would be able to make such transfers if they wanted.

21. According to brokerage records, which include background information as part of the broker-dealer's "Know Your Customer" requirements, Panait is a Romanian citizen. Attached as Exhibit 6 is a brokerage account application in which Panait identified his citizenship as Romanian.

22.     In the Complaint, in addition to the dealer registration violations against the GPL Defendants, the Commission has charged all Defendants, including the GPL Defendants, with securities fraud.  The Complaint charges the GPL Defendants with engaging in securities fraud both by secretly funding stock promotions involving Defendant HempAmericana, and by lying to their brokers about their involvement in promotional activities when depositing blocks of stock purchased from microcap issuers.  Attached as Exhibit 7 are examples of Dillon and Panait representing they are not involved in promotional activities.

23.     Based on their repeated conduct to date, it is likely that the GPL Defendants will continue to engage in acting as unregistered brokers going forward if they are not restrained and enjoined.

24.     Based on the GPL Defendants having utilized offshore accounts, and Panait's status as a Romanian citizen, it is likely that, absent an asset freeze and repatriation order, upon learning of the Commission's action the GPL Defendants may try to move their assets offshore, as well as to obtain untraceable cash by selling their assets.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:     New York, New York
              August 12, 2021

*Peter Lamore*
_____
Peter Lamore