UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
                                 :

SECURITIES AND EXCHANGE          :
COMMISSION,                          : **ORDER AND OPINION**
                                 : **DENYING THE MOTIONS TO**
                      Plaintiff, : **DISMISS THE COMPLAINT**
                                 :
             -against-                : 21 Civ. 6814 (AKH)
                                 :
GPL VENTURES LLC, GPL MANAGEMENT   :
LLC, ALEXANDER J. DILLON, COSMIN I.   :
PANAIT, HEMPAMERICANA, INC.,          :
SALVADOR E. ROSILLO, SEASIDE         :
ADVISORS, LLC, and LAWRENCE B.       :
ADAMS,                                 :
                                 :
                      Defendants. :
------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

       Plaintiff Securities and Exchange Commission ("SEC" or "Plaintiff") filed this

action against Defendants GPL Ventures LLC ("GPL Ventures"), GPL Management ("GPL

Management"), (collectively, the "GPL Entities"), and the GPL Entities' co-owners, Alexander

J. Dillon ("Dillon") and Cosmin I. Panait ("Panait"), (collectively, the "GPL Defendants");

HempAmericana, Inc. ("HempAmericana") and its Chief Executive Officer ("CEO") Salvador E.

Rosillo ("Rosillo"); and Seaside Advisors, LLC and its CEO, Lawrence B. Adams ("Adams"),[1]

alleging violations of Sections 15(a) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77 *et*

*seq.*, and Section 10(b) and Rule 10b-5 of the 1934 Securities Exchange Act, 15 U.S.C. § 78 *et*

*seq.*[2]  Complaint ("Compl."), ECF No. 1.   The GPL Defendants and HempAmericana and

---

[1] After this Complaint was filed, Adams passed away.

[2] The GPL Defendants are collectively charged with violating Section 15(a); Dillon and Panait are charged with control person liability under Sections 15(a) and 20(a); the GPL Defendants, HempAmericana, and Rosillo are charged with violating Section 17(a); Seaside and Adams are charged with violating Section 17(a)(1), (3); and all Defendants are charged, across two counts, with violating Section 10(b) and Rule 10b-5.

Rosillo, in separate motions, move to dismiss for failure to state a claim.  ECF Nos. 51, 53.  Both

motions are denied.

## BACKGROUND

The following facts are taken from the SEC's Complaint, which I must "accept[]

as true" for the purpose of deciding this motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Complaint generally describes the GPL Defendants' business as a series of scalping

schemes, whose operational aspects are illustrated through the HempAmericana Scalping

Scheme.  While the concept of the scheme is relatively simple, the number of individuals alleged

to have participated in effectuating the scheme makes this case appear more complex.

Accordingly, for clarity, I first identify the relevant players and then turn to the remainder of the

substantive allegations.

***The Relevant Players***

<u>The GPL Entities – GPL Ventures, GPL Management, Dillon, and Panait</u>

GPL Entities are in the business of privately acquiring and publicly selling the

securities of microcap issuers.  Compl. ¶ 23.  Dillon and Panait co-own the GPL Entities, and

Dillon previously held a Series 7 securities license and was briefly employed at a registered

broker-dealer from April 2013 to July 2013.  *Id.* ¶¶ 24–25.  Neither of the GPL Entities is

registered with the SEC, and neither Dillon nor Panait is associated with a registered broker or

dealer.  *Id.* ¶ 4.

<u>HempAmericana and Rosillo</u>

HempAmericana researches, develops, and sells products made of industrial

hemp, and Rosillo is its CEO.  It filed a certification and notice of termination of registration

under Exchange Act Section 12(g) or suspension of duty to file reports under Sections 13 and

15(d) on June 12, 2015.  Since its incorporation in 2014, HempAmericana has never been profitable, generating but $9,727 in revenues from 2017 through May 2020.  *Id.* ¶¶ 47–48. Disclosure statements filed on OTCMarkets' website have stated that the company must raise funds in order to finance operations; however, HempAmericana has not filed financial information with OTCMarkets since July 2020.  *Id.* ¶¶ 49–50.

Seaside and Adams

Seaside is a consulting firm for various microcap companies that assists with marketing, public relations, and general business advice, and Adams is its owner and CEO.  *Id.* ¶ 28–29.  Seaside sub-contracts others, including Individual A, to undertake promotional campaigns to increase stock prices.  *Id.* ¶ 57.

Individual A

Individual A is a professional stock promoter who operates promotional campaigns to increase the prices of stocks.  *Id.* ¶¶ 43, 57.   He hires other promoters or middlemen, who in turn, hire yet other promoters, to promote stocks, and as is relevant here, received compensation from Seaside.

***The Scalping Scheme and the GPL Entities' Business Model***

Since at least early 2017 and continuing to the present, the GPL Defendants have been privately acquiring large blocks of discounted shares of stock in approximately 140 microcap issuers and publicly selling those blocks into the market for their own account, generating gross proceeds of at least $81 million."  *Id.* ¶¶ 2, 4, 33.  Dillon and Panait coordinate and authorize all of the GPL Entities stock trading.  *Id.* ¶ 34.

The GPL Defendants engage in "scalping"—secretly funding promotional activity in microcap issuers whose stock they trade.  *Id.* ¶ 8.  Scalping involves a defendant (i) acquiring

3

shares of a stock for his own benefit prior to recommending or touting that very stock to others, (ii) failing to disclose in the tout the full details of his ownership of the shares and his plans to sell them, and (iii) proceeding to sell his shares following the tout's dissemination, and into the share price and trading volume increases triggered by his touting.  *Id.* ¶ 9.  The scheme works as follows.  The GPL Defendants engage cold-callers to pitch GPL Ventures to publicly traded microcap issuers, offering capital infusions to support the issuers' operations, or pitching or providing services, such as installing an "investor relations" firm, or introducing an in-house accountant to assist with preparing the issuers' financial statements.  *Id.* ¶¶ 35–36.  Once an issuer agrees to be funded, the GPL Defendants acquire large blocks of the issuer's unrestricted stock at a steep discount, either by: 1) purchasing aged convertible notes from the issuer's debtholders, which notes the GPL Defendants then convert into shares; or 2) purchasing shares directly from the issuer through qualified Reg. A offerings.  *Id.* ¶ 37.  The GPL Defendants generally sell newly acquired shares into the market before purchasing new blocks in the same issuer.  *Id.* ¶ 38.

### *The HempAmericana Scalping Scheme*

From 2017 through at least late 2019, the GPL Defendants' scalping activities included buying and selling large blocks of HempAmericana securities, generating profits of approximately $11 million.  *Id.* ¶¶ 10, 41.  Dillon oversaw this scheme.  *Id.* ¶ 53.  The Complaint describes the HempAmericana scheme as follows: (1) the GPL Defendants repeatedly acquired stock purportedly sold pursuant to the Reg. A registration exemption, conditioned on a portion of the stock sales proceeds being sent by the issuer to Seaside; (2) Seaside then paid Individual A, a professional stock promoter; (3) Individual A hired promoters, or middlemen, who in turn hired other promoters, to promote the stock; (4) the GPL Defendants sold the stock during the

promotional campaigns, which did not disclose that the promotions were indirectly funded by the issuer, HempAmericana, using the proceeds received from the GPL Defendants, the most significant purchaser in the issuer's qualified Reg. A offerings, or that the GPL Defendants intended to sell their large stock holdings during the promotion.  *Id.* ¶ 43.  To deposit and sell their HempAmericana shares, the GPL Defendants told their brokers that they were not involved in the promotional activities; the "Use of Proceeds" representations in HempAmericana's Reg. A offering circulars also do not mention that significant portions of the stock sales proceeds would be used for stock promotion.  *Id.* ¶¶ 44–45.  Instead, the Reg. A offering circulars, which Rosillo and HempAmericana filed with the SEC, along with offering statements on Forms 1-A, state that the capital raised would be used "to grow [HempAmericana's] business."  *Id.* 54.

Shortly after HempAmericana's first Reg. A capital raise was qualified on June 29, 2017, Rosillo began issuing unrestricted Reg. A shares to the GPL Defendants, and from July 2017 to November 2019, the GPL Defendants sequentially acquired the majority of the issued unrestricted shares.  *Id.* ¶ 51–52.  Dillon would purchase additional tranches of shares in the Reg. A offerings, only if the GPL Defendants could successfully sell their existing shares into the market.  *Id.* ¶ 53.

The GPL Defendants also conditioned their investment in HempAmericana upon HempAmericana hiring Seaside to promote the company's stock and using a portion of the GPL Defendants' investment to fund a marketing campaign to promote the stock.  *Id.*  ¶ 56–57.  Accordingly, Dillon introduced Rosillo to Adams and Individual A, and required that Rosillo hire Seaside as a "consultant;" Seaside would then sub-contract Individual A to undertake a wide-ranging promotional campaign to enable the GPL Defendants to sell their shares at a profit.  *Id.* ¶ 57.  HempAmericana only publicly disclosed that it retained Seaside as a consultant.  *Id.* ¶

58.  The GPL Defendants further directed the specific split of offering proceeds between HempAmericana and Seaside.  For example, in August 2017, when the GPL Defendants purchased 16 million shares of stock for $80 million, the funds went to a HempAmericana escrow account, from which Dillon instructed that $50,000 be sent to HempAmericana and $30,000 to Seaside.  *Id.* ¶¶ 59–60.

Once Seaside received the GPL Defendants' money through HempAmericana, it forward varying amounts, but generally more than half, to Individual A for promotional activity. *Id.* ¶ 61.  Of the $7.4 million in stock purchase proceeds that the GPL Defendants paid to HempAmericana, $2.18 million was paid by HempAmericana to Seaside, and Seaside forwarded nearly sixty percent to Individual A.  *Id.* ¶ 62.  Individual A was in direct communications with both Rosillo and the GPL Defendants, and Dillon and Rosillo were fully aware of Individual A's role in promoting HempAmericana Stock.  *Id.* ¶ 63.  In May 2019, for example, Adams assured Individual A that he would be compensated for his promotional efforts, but the funds could not come directly from the escrow account because the GPL Defendants' brokerage firm would not so permit; thus, the funds would come from Rosillo.  *Id.* ¶ 64.  And in June 2019, in reference to the GPL Defendants' budget for promotions, Dillon indicated that he understood Individual A and Adams to be one and the same, and that they split the money.  *Id.* ¶ 65.

Individual A used HempAmericana proceeds from the GPL Defendants' stock purchase to hire two kinds of people to promote the stock: First, he hired people whom he understood to have email lists or social media mechanisms that would enable them to get buyers into the stock, apparently with the promise of buying cheaper stock in advance of the promotion, and second, he hired people who would in turn pay others to engage in more traditional promotional activity during the actual "pump."  *Id.* ¶¶ 67–69.  In January 2018, for example, the

GPL Defendants purchased $170,000 of HempAmericana stock.  $70,000 of the sales proceeds went to Seaside, and $55,000 of that amount went to Individual A, who in turn paid an entity, "Entity A."  *Id.* ¶ 70.  Later that month, another entity, "Entity B," put out email blasts promoting HempAmericana stock and disclosing that it was compensated by Entity A, which was described as a non-affiliated third party.  *Id.* ¶ 71.  The promotion's disclaimer said that Entity B did not own any shares in HempAmericana and made no reference to anyone intending to sell shares into the promotion.  *Id.* ¶ 72.  The promotions did not disclose HempAmericana or the GPL Defendants as the ultimate source of funding for the promotions, nor did they disclose Seaside or Individual A's roles in facilitating payment from the GPL Defendants to downstream promoters, or any affiliation between Seaside, Individual A, and HempAmericana.  *Id.* ¶¶ 74–75.

During the course of the HempAmericana scalping scheme, the GPL Defendants paid $7.4 million to acquire more than 1.5 billion shares of HempAmericana stock and, in conjunction with Individual A's promotional activity, they sold the shares for more than $18.4 million, generating approximately $11 million in illegal profit.  *Id.* ¶ 79.  Individual A generally kept Dillon apprised of the promotions, advising on when the buying volume would increase and on the strategy for selling the stock, and on at least one occasion, requested that Dillon sell some stock into the market at a lower pre-promotion price to enable Individual A's "guys," i.e., his sub-promoters, to get in the stock more cheaply due to an apparent shortfall in Individual A's spending for promotion.  *Id.* ¶¶ 80–81.  Nevertheless, in response to repeated requests from the GPL Defendants' broker-dealers for affirmation as to whether the GPL Defendants were involved in stock promotions, when the GPL Defendants sought to depot and sell the shares obtained from HempAmericana and other issuers, Dillon and Panait repeatedly assured the broker-dealers that they were not involved in any promotional activity.  *Id.* ¶¶ 82–83.  Such

assurances included numerous deposit request forms, in which they denied to Broker-Dealer A, for example, that they were "currently promoting" HempAmericana, and denied, "at any time while selling the securities on deposit in the account," having any "plan to promote or engage a third party to promote . . . the issuer's securities." *Id.* ¶ 84.  Dillon also directly denied involvement in stock promotion when confronted by Broker-Dealer A's compliance personnel. *Id.* ¶ 85.

As to Rosillo and HempAmericana, in connection with HempAmericana's four qualified Reg. A offerings, Rosillo signed and certified the company's filings with the SEC, and each offering circular represented that HempAmerciana planned to sue the offering proceeds to "grow its business." *Id.* ¶ 87–88.  A table in the offering circular estimated that HempAmericana planned to allocate offering proceeds across the following categories: "Marketing and marketing staff," "Sales and sales staff," "Inventory," "Distribution/production warehouse," "Factory, Equipment and Machinery," "Other staff and operating costs," and "Investments in hemp-related going concerns (including licenses)." *Id.* ¶ 89–90.  A further explanation for the Marketing and Sales categories, for which a combined total of up to twenty percent of expected proceeds were allocated, provided: "Marketing and Sales will largely be related to the hiring and payment of a human sales team as well as advertising costs associated with online advertising platforms such as Google Adwords (sic) and Facebook, as well as paying directly to websites per their ad and affiliate programs."  HempAmericana never disclosed it intended to use a substantial portion of the stock sale proceeds—ultimately approximately twenty-nine percent—toward promoting the stock rather than growing or marketing the company's products and business. *Id.* ¶ 92.

Plaintiff alleges that Defendants violated the federal securities laws and brings charges under: (i) Section 15(a) of the Exchange Act against the GPL Defendants for failing to

register as a broker-dealer; (ii) Section 15(a) against Dillon and Panait for control person

liability; (iii) Section 17(a) of the Securities Act against the GPL Defendants, HempAmericana,

Rosillo, Seaside, and Adams for employing a scheme to defraud purchasers; and (iv) Section

10(b) of the Exchange Act and Rule 10b-5 against the GPL Defendants, HempAmericana,

Rosillo, Seaside, and Adams for material misstatements or omissions as part of a scheme to

defraud.

The GPL Defendants, and HempAmericana and Rosillo, each move to dismiss the

complaint for failure to state a claim for relief.  *See* Motion to Dismiss by the GPL Defendants

("MTD GPL"), ECF No. 54; Motion to Dismiss by HempAmericana and Rosillo ("MTD

Hemp"), ECF No. 52.

## DISCUSSION

I. Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  When

considering a motion to dismiss a complaint under Rule 12, the Court must "accept[] all of the

complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiff's

favor."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *Gregory v.*

*Daly*, 243 F.3d 687, 691 (2d Cir. 2001), as amended (Apr. 20, 2001).  However, the Court is "not

bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at

678.  The Court is limited to a "narrow universe of materials."  *Goel v. Bunge, Ltd.*, 820 F.3d

554, 559 (2d Cir. 2016).  "Generally, [courts] do not look beyond 'facts stated on the face of the

complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'" *Id.* (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)) (alterations in original).

II. Analysis

    A. The GPL Defendants

        1. Section 15(a)

            a. Unregistered Broker-Dealer Activity

Section 15(a) of the Exchange Act makes it unlawful for an unregistered broker or dealer to "make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. § 78o(a)(1). The Act defines a dealer as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A).

The GPL Defendants make several arguments as to why they cannot be held liable for violating Section 15(a), none of which is persuasive. I address each in turn.

First, they argue that they do not engage in "the business of buying or selling securities" or in dealer conduct, within "the ordinary meaning" of those phrases, under FINRA Rules, or other SEC guidance, such as a no-action letters, including one from 1977. MTD GPL, at 11–27. Curiously, the GPL Defendants neither cite nor discuss *Martino* in their opening brief, instead appearing to treat the question as one of first impression. They rely on irrelevant cases construing the term "dealer," including an 1880 case from the North Carolina Supreme Court and a 1929 case from the Texas Court of Appeals, both of which quite obviously pre-date the passage of the 1933 Securities Act, and neither of which has any bearing on the meaning of *federal* securities laws. The brief nevertheless opines ad nauseum on how the GPL Defendants' conduct does not amount to being in "the business of buying and selling securities."

The Complaint alleges that the GPL Defendants' business involved orchestrating scalping schemes, whereby the GPL Defendants would acquire securities in companies, contingent upon those companies working with a third-party promoter.  The promoter would then market and drive up the price of the stock, at which point the GPL Defendants would sell their shares for a profit.  The target company and the promoter would share the value of the GPL Defendants initial investment.  Even applying "the ordinary meaning," I find that the Complaint plausibly alleges that the GPL Defendants were engaged in "the business of buying and selling securities" for the simple fact that the scheme, in fact, involved buying and selling securities.

The GPL Defendants next emphasize that they had no customers and provided no services, and therefore, cannot be dealers.  *See* MTD GPL, at 22–26.  They focus on the selling aspect of their activities and argue that, at most, they engage in conduct typical of a trader.  They further fault the Complaint for "say[ing] nothing about temporal duration" and direct my attention to SEC guidance from 1975 and a treatise authored by FINRA's chief legal officer in support of the proposition that to satisfy the dealer definition, there must be "offsetting two-sided activity" or "conjunctive buying and selling."  *Id.* at 26.  These arguments are without merit.  Under *Martino* and the SEC's guidance, the relevant focus is on "the activities that the person or business performs," not whether a person or business has "customers" or "provides services."

Alternatively, the Defendants assert that Due Process precludes a finding that they are dealers, arguing that endorsing the SEC's "novel interpretation" of dealer and imposing liability would contravene the Due Process Clause.  *See* MTD GPL, at 27–31.  The Due Process Clause is not implicated here.  Ignorance of the law provides no defense, and imposing liability upon a person who fails to apprise himself of the law violates no constitutional rights.[3]

---

[3] Even if such a principle existed, it would not save the GPL Defendants here.  The Complaint alleges that Dillon previously had a Series 7 securities license and was previously briefly employed at a registered broker-dealer.  From this, I would plausibly infer that Dillon was aware of the registration requirements and knew or should have known that failing to register as required would expose himself or the relevant entity to liability under Section 15(a).

Turning to relevant precedent, as noted above, in determining whether an individual or entity is required to register under Section 15(a), courts consider whether the individual or entity may be "characterized by 'a certain regularity of participation in securities transactions at key points in the chain of distribution.'" *SEC v. Martino*, 255 F. Supp. 268, 283 (S.D.N.Y. 2003). They further consider "whether the alleged broker [or dealer] satisfies some of the following factors: 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors." *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 453 (E.D.N.Y. 2016) (internal quotation marks and citation omitted) (noting that most courts do not require the SEC to establish all factors, but a combination of factors establishing a defendant acted as a broker); *see also SEC v. Rabinovich & Assocs., LP*, No. 07-CV-10547, 2008 U.S. Dist. LEXIS 93595, at *5 (S.D.N.Y. Nov. 18, 2008) ("Among the activities indicative of being a broker are soliciting investors, participating in the securities business with some degree of regularity, and receiving transaction-based compensation."); *see also* SEC, Guide to Broker-Dealer Registration (Apr. 2008), available at http://www.sec.gov/divisions/marketreg/bdguide.htm, at 4-5 ("In order to determine whether [an individual] . . . is a broker, we look at the activities that the person or business actually performs," and ask, for example, whether it "participate[s] in important parts of a securities transaction, including solicitation, negotiation, or execution of the transaction," receives "transaction-related compensation," and/or "handle[s] the securities or funds of others in connection with securities transactions.").

I find that Plaintiff plausibly states a claim against the GPL Defendants under Section 15(a). The Complaint describes a course of conduct characterized by a certain regularity of participation in securities transactions at key points. It alleges that the GPL Defendants would

provide an initial investment and purchase securities, and after the promoter successfully drove

up the price by marketing the securities, the GPL Defendants would then sell their shares back

into the market.  And it alleges that the GPL Defendants regularly orchestrated this scheme,

citing HempAmericana as an illustration, in which Defendants solicited investors, albeit

indirectly, through the third-party promoter, effectively acting as middlemen.  And it alleges that

the GPL Defendants have orchestrated this scheme with numerous issuers since 2017,

demonstrating "regularity of business activity."  *See Martino*, 255 F. Supp. 2d at 283–84

(holding that defendants "plainly acted as unregistered brokers" where defendants "regularly

solicited overseas clients" to engage in securities transactions, "regularly acted as middlemen

between the U.S. sellers and foreign purchasers[,]" were not employed by their clients,

"participated in the sale of stock of numerous issuers over a period of several years," and

"assisted in negotiating the stock sales at issue").

As to the *Martino* factors, first, quite obviously, none of the GPL Defendants are

employees of HempAmericana, and therefore, did not receive a salary from HempAmericana.

The Complaint alleges that the GPL Defendants bought and sold securities in numerous

microcap issuers—that the scheme as alleged was the GPL Defendants' business model.  Their

initial investments in microcap issuers were conditioned upon use of consultants that would drive

up the price of the stock through promotional campaigns, the purpose of which was to enable the

GPL Defendants to sell their shares and recoup their initial investments at a profit, a sort-of

commission-based return for their initial investments.  Further, the GPL Defendants advised the

microcap issuers on who those consultants should be, or in the case of HempAmericana, required

that it use Seaside.

While the Complaint does not specifically allege that the GPL Defendants were

involved in the negotiations between issuers and investors, it does allege that the GPL

Defendants were involved in negotiating the rates paid to third-party promotional consultants,

who in turn, were charged with encouraging investors to purchase the stock.  And the Complaint specifically alleges that the GPL Defendants instructed the target companies to share Defendants' initial investment with the promoter and directed the precise numerical split.  In sum, I find that the Complaint plausibly alleges that the GPL Defendants' business model involved a regularity of business activity largely approximating that of a broker-dealer, requiring them to register with the SEC.  Because neither of the GPL Entities was so registered, and neither Dillon nor Panait was associated with a registered broker-dealer, Plaintiff plausibly alleges that the GPL Defendants violated Section 15(a).  *See SEC v. Martino*, 255 F. Supp. 2d at 283–84; *see also SEC v. Hansen*, No. 83-CV-3692, 1984 U.S. Dist. LEXIS 17835, at *10–11 (S.D.N.Y. Apr. 6, 1984) (holding that defendant acted as an unregistered broker in violation of section 15(a)(1) where he was paid commission, rather than a salary, previously sold securities of another issuer, and actively and aggressively found investors); *see also SEC v. Margolin*, No. 92-CV-6307, 1992 U.S. Dist. LEXIS14872, at *5 (finding likelihood that defendant was an unregistered broker where, among other things, defendant "participated in dozens of transactions for various clients," demonstrating "regularity of business activity which supports the statutory definition of broker or dealer").[4]

   Accordingly, the motion to dismiss the Section 15(a) claims against the GPL Defendants is denied.

       b. Control Person Liability

   Control person liability under Section 20(a) is "a form of secondary liability, under which a plaintiff may allege a primary violation by a person controlled by the defendant

---

[4] Neither *Martino* nor SEC Guidance requires "offsetting two-sided activity" as a prerequisite to finding broker-dealer activity, but even assuming such a requirement existed, the Complaint does allege "conjunctive buying and selling" and a temporal duration—it alleges that they purchased shares through an orchestrated investment and waited for the promoter to market and drive up the price of the shares before selling their shares back into the market.

and culpable participation by the defendant in the perpetration of the fraud." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (citing *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).  To state a claim under Section 20(a), a plaintiff must allege at least two elements: (1) "a primary violation by [a] controlled person" and (2) direct or indirect "control of the primary violator by the defendant." *First Jersey*, 101 F.3d at 1472.  Control may be established by showing that the defendant possessed, either directly or indirectly, "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2; *see In re Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414–15 (S.D.N.Y. 2003) (noting that the court in *First Jersey* adopted the definition of control in 17 C.F.R. § 12b-2 as the standard for a Section 20(a) claim); *accord. Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 326 (S.D.N.Y. 2006).

The Complaint plausibly and adequately alleges such liability.  As discussed above, it plausibly alleges a Section 15(a) violation, and that Defendants Dillon and Panait were co-owners and in control of GPL Ventures and GPL Management.  Their status as co-owners easily satisfies the test.  *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 253 (S.D.N.Y. 2018) (finding allegations of control liability against a defendant who was the creator, majority owner, and a director of the primary violator, and defendant who was the chief executive officer, president, and director, "easily [met] the test").

Defendants Dillon and Panait argue that the Complaint fails to state a claim for control person liability because it does not adequately allege their "culpable" participation.  They rely on *In re Cannavest Corp. Sec. Litigation*, for the proposition that "[t]he majority view in this direct appears to be that allegations of 'culpable' participation are essential to a section 20(a) control-person claim, and that 'a plaintiff must plead "particularized facts of the controlling person's conscious misbehavior or recklessness.'"  Motion, at 31–32 (citing 307 F. Supp. 3d 22,

254, 256 (S.D.N.Y. 2018)).  Defendants' reliance is utterly mistaken, and their citation is stripped of its context.  In the portion of the opinion that Defendants cite, the court addressed claims brought against a person who was merely a director and member of an audit committee in the context of Section 10(b) and Rule 10b-5 violations.  *See id.* at 254.  The court's subsequent admonition that a plaintiff must show "culpable" participation through "particularized facts of . . . conscious misbehavior or recklessness," *id.*, related to the scienter requirement to establish the primary violations at issue.  Here, in contrast, Section 15(a) has no scienter requirement. Plaintiff need not allege scienter to plausibly state a claim for control person liability.

As Plaintiff plausibly alleges both a primary violation and that Defendants Dillon and Panait had control over the GPL Entities, the motion to dismiss the claims for control person liability is denied.

2. Section 10(b) and Rule 10b-5 and Section 17(a)

Rule 10b-5 makes it "unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud"; "(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading"; or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  To establish a violation of subsection (b), the SEC must allege that the defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC v. Fiore*, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019 (quoting *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (citation and quotation marks omitted)).  To establish a violation of subsections (a) or (c), "the SEC must allege that the defendant (1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter."  *Id.* (quoting *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (citations omitted)).  A "manipulative or deceptive act" is "some

act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). The requisite state of mind, scienter, requires an "intent to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation and quotation marks omitted). Additionally, "[m]arket manipulation comprises a class of conduct prohibited by Section 10(b), which typically involves practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting the market activity." *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 641 (S.D.N.Y. 2004) (citation and quotation marks omitted), on reconsideration in part, No. 99-CV-793, 2004 U.S. Dist. LEXIS 15610 (S.D.N.Y. Aug. 10, 2004).

Similarly, Section 17(a) forbids: "(1) the direct or indirect use of any device, scheme, or artifice to defraud; (2) obtaining money or property through misstatements or omissions of material facts; and (3) any transaction or course of business that operates as a fraud or deceit upon a purchaser of securities." *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018) (citing 15 U.S.C. §§ 77q(a)(1)–(3)). The first subsection requires proof of scienter, while the other two sections require only proof of negligence. *See Aaron v. SEC*, 446 U.S. 680, 697 (1980) ("[T]he language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)."). "The elements of a claim under § 17(a) . . . are essentially the same as the elements of claims under § 10(b) and Rule 10b-5." *Frohling*, 851 F.3d at 136 (cleaned up). Because "[s]ection 10(b), Rule 10b-5[,] and [s]ection 17(a) all sound in fraud[,] . . . the SEC must state the circumstances constituting fraud or mistake with particularity." *Thompson*, 238 F. Supp. 3d at 591 (citing Fed. R. Civ. P. 9(b)) (quotation marks omitted); *accord. SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010). I find that the Complaint plausibly alleges the requisite elements to sustain claims under Section 10(b) and Rule 10b-5, and because of the overlap, claims under Section 17(a) as well.

The GPL Defendants argue that with respect to the Section 10(b) and Rule 10b-5 violations, the Complaint fails to state a claim under any of the subsections of Rule10b-5.  As to a violation under Rule 10b-5(b), they argue that the Complaint fails to plausibly allege an actionable false or misleading statement, or that such a statement was made with the requisite scienter or in connection with an actionable scheme.  *See* MTD GPL, at 29–39, 46–49.  As to possible violation under Rule 10b-5(a) and (c), they argue that Supreme Court precedent, discussed below, forecloses liability here.  *See id.* at 39–40.  Finally, because claims under Section 17(a) are identical to those under Section 10(b) but have a lesser scienter requirement, they conclude that the Section 17(a) claims must also fail.  None of these arguments is availing.  *See id.* at 48–50.

The Complaint does not specifically charge that the GPL Defendants violated any particular subsection of Rule 10b-5; rather, it brings claims generally under that Rule.  *See* Compl. ¶¶ 103–05.  As such, so long as the Complaint plausibly alleges a violation of any subsection, Plaintiff survives the motion to dismiss.  I find that the Complaint plausibly alleges violations of each subsection.

As to a possible claim under Rule 10b-5(b), the Complaint alleges that the GPL Entities, through Dillon, made misstatements about their involvement with promotional activity in the microcap issuers.  It specifically alleges that Dillon repeatedly affirmed to his brokers that the GPL Entities were not involved.  The purpose of this misstatement was quite obviously to enable Defendants to execute the trades for a profit.

As to possible claims under Rule 10b-5(a) or (c), contrary to the GPL Defendants' assertions, the basis for the Complaint is not merely material misstatements or omissions.  Rather, the Complaint describes a business model that can easily be characterized as a "scheme" or "artifice to defraud," or described as a "course[] of business which operated or would operate as a fraud or deceit upon other persons."  The GPL Defendants' business constituted making

investments, at steep discounts, and then recouping those investments at substantial profit.  In order to ensure those profits, they orchestrated and contrived a marketing apparatus, that would drive up the market price of the stock.  The use of third-party promoters, such as Seaside and Individual A, artificially distanced the GPL Defendants, disguising the fact that Defendants were funding the marketing or were otherwise involved.  And they used this device in connection with the sale of securities—namely, to artificially drive up the price of the securities they acquired in the Reg. A offerings, with a plan in place to ensure they could redeem them for a handsome profit.  Accordingly, the Complaint alternatively plausibly states a claim for relief under Rule 10b-5(a) or (c).

As to liability under Rule 10b-5(a) or (c), the GPL Defendants argue that notwithstanding the Supreme Court's decision in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), there can be no scheme liability because the only alleged deceptive conduct is premised on misstatements, and therefore, any potential liability is foreclosed by *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).

Neither *Janus* nor *Lorenzo* forecloses liability here.  In *Janus*, the Supreme Court held that an advisor who played a role in preparing or approving an entity's required disclosures could not be held liable under Rule 10b-5(b) for "ma[king] . . . material misstatements in [the entity's] prospectus[]."  *Janus*, 564 U.S. at 141.  In *Lorenzo*, however, the Court held that even if a party could not be held liable for "mak[ing]" material statements or omissions under Rule10b-5(b), such a party could still be liable under subsections (a) or (c), and therefore still be charged with violating Section 10(b) of the Exchange Act or Section 17(a) of the Securities Act. *Lorenzo*, 139 S. Ct. at 1099.   The Court stated that "even a bit participant in the securities markets may be liable as a primary violator[,]" *Lorenzo*, 139 S. Ct. at 1104, where a defendant is alleged not to have "simply facilitated manipulative conduct," but rather to be a "coparticipant[] . . . in the manipulative scheme and profited by that scheme[.]"  *City of Providence, Rhode Island*

*v. Bats Glob. Markets, Inc.*, 878 F.2d 36, 51 (2d Cir. 2017).  Neither *Lorenzo* nor *Janus*
forecloses liability here, and indeed, *Lorenzo* expressly stated that *Janus* would not preclude
liability when an "individual is . . . involved in some other form of fraud."  *Lorenzo*, 139 S. Ct. at
1103.

        The Complaint clearly alleges the GPL Defendants were "involved in some other
form of fraud"—namely, the orchestration of a complex marketing apparatus aimed at driving up
the market price of stocks, so that they could recoup their initial investments at substantial profit.
And the GPL Defendants were neither mere facilitators of manipulative conduct nor passive or
fortuitous beneficiaries; rather, the Complaint alleges that they made "cold calls" to target
microcap issuers, conditioned their investments upon such issuers using certain consulting firms,
and at least with respect to HempAmericana, directed how the GPL Defendants' initial
investment should be split between HempAmericana and Seaside.  Indeed, the Complaint alleges
far more than that the GPL Defendants were "co-participant[s]" who "profited" by the scheme; it
alleges that the GPL Defendants were the puppetmasters of a scheme to launder their
investments for profit.  These calculated actions more than adequately allege the necessary
scienter to survive the motion to dismiss the Section 10(b) claims, and because Section 17(a)
does not even require any misstatement or material omissions, I find that the claims for liability
under Section 17(a) are also plausibly alleged.

        In sum, as to the GPL Defendants, the Complaint plausibly alleges violations of
Section 15(a) and control person liability, as well as violations under Sections 10(b), Rule 10b-5,
and 17(a).  Accordingly, the GPL Defendants' motion to dismiss is denied.

    B. HempAmericana and Rosillo

        Defendants HempAmericana and Rosillo seek to dismiss the complaint against
them on the grounds that HempAmericana did not make or disseminate the promotional
statements, and that the securities laws do not preclude an issuer from paying for a stock

recommendation; that the Reg A circulars were not false or misleading, or in the alternative, that any false or misleading statements were immaterial.  MTD Hemp, at 8–15.  In addition, they argue that Plaintiff has not adequately alleged scienter.  *Id.* at 15–17.  I disagree.

The Reg. A circulars were undoubtedly misleading, and the statements were material.  HempAmericana argues that it was not under a duty to disclose that it paid a promoter, and that in any event, the securities laws do not prohibit an issuer from paying for a stock recommendation.  That may very well be, but the Complaint is not concerned with the mere fact that HempAmericana paid for a recommendation or marketing services provided by Seaside and Individual A.  Rather, the Complaint concerns itself with the nature of the relationship—that HempAmericana's relationship with Seaside and Individual A were ultimately sham artifices to facilitate the laundering of the GPL Defendants' investment for profit.  Obscuring HempAmericana's relationship was itself a material omission.

The substance of HempAmericana's public disclosures, certified by Rosillo, was also misleading.  The circulars stated that HempAmericana would use the funds in part for marketing and sales, described as being "related to the hiring and payment of a human sales team as well as advertising costs associated with online advertising platforms such as Google Adwords (sic) and Facebook, as well as paying directly to websites per their ad and affiliate programs."  An ordinary reasonable investor would construe the foregoing as being aimed at increasing sales of its actual product, particularly given that HempAmericana purported to be a company that sold products.  To the extent that HempAmericana and Rosillo meant to convey an intent to market the stock itself, the statements were either misleading or unlawful.

Ultimately, however, whether HempAmericana made the promotional statements is irrelevant.  As noted above with respect to the GPL Defendants, the Complaint does not

premise liability solely upon HempAmericana and/or Rosillo's misstatements or omissions.  Just as the Complaint adequately alleges violations of Rule 10b-5(a) and (c) with respect to the GPL Defendants, so too does it plausibly allege those violations with respect to HempAmericana and Rosillo, regardless of whether they are deemed primary violators.  HempAmericana accepted the GPL Defendants' investments, which were conditioned upon HempAmericana hiring and working with Seaside and Individual A.  HempAmericana and Rosillo were willing participants in the GPL Defendants' scheme.

As to that scheme, I find that the Complaint plausibly alleges that HempAmericana and Rosillo had the requisite scienter to be held liable for their participation. First, it plausibly alleges that HempAmericana and Rosillo were willing participants in the scheme.  They were aware of the terms of the GPL Defendants' investment, and that more than half of the investment was going to fund the promotional activity.  Indeed, Rosillo paid Individual A because the GPL Defendants' brokerage firm would not allow the funds to come from HempAmericana's escrow account.  In addition, the Complaint alleges that Individual A was in contact with both Rosillo and the GPL Defendants, leading to a strong inference that all of the various actors in this complex scheme were working in concert and with the express understanding that the purpose was to drive up the price of HempAmericana's stock.  Finally, based upon the allegations that prior to the GPL Defendants' investment, HempAmericana had never been profitable, it strains credulity to think that neither HempAmericana nor Rosillo knew what was going on.  And if they simply thought that previously uninterested investors suddenly saw substantial value in HempAmericana's stock, despite no other changes in business operations or financial prospects, then they were willfully blind to the material circumstances surrounding HempAmericana's sudden change in fortune.

Because HempAmericana and Rosillo do not argue that the Complaint is deficient with respect to any other required element, and because I find their arguments otherwise meritless, I hold that the Complaint plausibly alleges violations of Section 10(b) and Rule 10b-5 under the Exchange Act and Section 17(a) of the Securities Act.  Accordingly, HempAmericana and Rosillo's motion to dismiss also is denied.

## CONCLUSION

For the reasons provided above, the respective motions to dismiss the complaint against the GPL Defendants and HempAmericana and Rosillo are denied.  Defendants shall answer, and the parties shall make initial disclosures.  The Initial Case Management Conference shall be held February 25, 2022, at 10:00 a.m.  The Clerk of the Court shall terminate ECF Nos. 51, 53.


SO ORDERED.

Dated:      January 18, 2022               _____/s/ Alvin K. Hellerstein_____
            New York, New York                 ALVIN K. HELLERSTEIN
                                               United States District Judge

23